******************************************************

   The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

   All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

   The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# SHANOAH WALCOTT *v.* COMMISSIONER OF CORRECTION
## (AC 47765)

Alvord, Clark and Seeley, Js.

*Syllabus*

The petitioner, who previously had been convicted, on a plea of guilty, of manslaughter in the first degree with a firearm, appealed following the granting of her petition for certification to appeal from the habeas court's judgment denying her petition for a writ of habeas corpus. She claimed, inter alia, that she was denied due process under *Brady* v. *Maryland* (373 U.S. 83) when the state failed to disclose to her a cooperation agreement it allegedly had with her cousin in exchange for his written statement and likely testimony implicating her in the victim's death. *Held*:

The habeas court properly denied the petitioner's claim that her trial counsel rendered ineffective assistance by failing to conduct an adequate investigation of her case, as the petitioner's assertion that key witnesses would have provided exculpatory evidence was based on speculation, and the petitioner did not present any of those witnesses at the habeas trial, let alone show what information they may have had that would have been helpful to her case.

The petitioner could not prevail on her claim that her trial counsel provided ineffective assistance by failing to meaningfully explain to her the state's plea offer or advise her regarding her guilty plea, as the habeas court credited counsel's testimony that he had multiple conversations with the petitioner about the strengths and weaknesses of the state's case, the evidence against her and her cousin's statement implicating her in the victim's death, which, if believed by a jury, could have resulted in the petitioner's conviction and exposed her to more than 100 years of incarceration.

This court concluded, in light of *United States* v. *Ruiz* (536 U.S. 622), in which the United States Supreme Court held that the federal constitution does not require the government to disclose material impeachment evidence prior to entering into a guilty plea agreement with a criminal defendant, that the habeas court properly denied the petitioner's claim that she was denied due process in violation of *Brady* when the state failed to disclose to her an alleged agreement it had with her cousin, as *Brady* imposed no obligation on the state to disclose an alleged cooperation agreement prior to the start of a trial.

Argued November 17, 2025—officially released April 14, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Wagner, J.*; judgment denying

the petition, from the petitioner, on the granting of certification, appealed to this court. *Affirmed*.

*Mary Boehlert*, assigned counsel, for the appellant (petitioner).

*Rebecca Z. Oestreicher*, special deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Emily Trudeau*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SEELEY, J. On the granting of certification, the petitioner, Shanoah Walcott, appeals from the judgment of the habeas court denying her amended petition for a writ of habeas corpus, in which she alleged a claim of ineffective assistance of her criminal trial counsel, Attorney J. Patten Brown III, and that the prosecutor had improperly failed to disclose an agreed upon sentence and disposition for a state's witness prior to jury selection, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 101 L. Ed. 2d 215 (1963).[1] On appeal, the petitioner claims that the habeas court improperly concluded that she failed to meet her burden of demonstrating her claim (1) in count one of her amended habeas petition of deficient performance by Attorney Brown and that she was prejudiced thereby, and (2) in count two, that she was denied due process as a result of the state's violation of *Brady* "prior to and/or during jury selection . . . ." We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to the petitioner's claims. The petitioner had been charged by way of a long form information with murder

---

[1] "In *Brady*, the United States Supreme Court held that '[t]he defendant has a right to the disclosure of exculpatory evidence under the due process [clause] of . . . [the fourteenth amendment to] the United States constitution . . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material.'" *State* v. *Andres C.*, 349 Conn. 300, 329, 315 A.3d 1014, cert. denied,     U.S.    , 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024).

in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c,[2] robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and carrying a pistol without a permit in violation of General Statutes (Rev. to 2007) § 29-35 (a). The charges against the petitioner stemmed from the robbery and shooting death of the victim, Jepther White, who had been shot at close range in the head, shoulder and back, and was found inside a vehicle by officers with the Hartford Police Department on August 28, 2007. The vehicle was parked behind an apartment building at 364 Wethersfield Avenue in Hartford. The police did not recover a firearm or forensic evidence from the vehicle. Although a confidential witness identified the petitioner as the shooter from a photographic array in 2008, the petitioner was not arrested at that time. The case was reinvestigated in 2012, when another confidential witness identified the petitioner as the shooter from a photographic array, an arrest warrant was issued for the petitioner in July, 2012, and she subsequently was arrested and presented in court for arraignment on August 6, 2012. Jury selection began on April 6, 2015, before the court, *Suarez*, *J.*, and ended on April 16, 2015. The petitioner was represented by Attorney Brown.

On the morning of April 28, 2015,[3] the prosecutor presented the petitioner's attorney with a written statement made by the petitioner's cousin, Anthony Brown, stating that the petitioner had asked Anthony Brown for shelter because she had murdered someone. Attorney Brown, in turn, brought the statement to the petitioner to discuss it with her. According to Attorney Brown, the statement from Anthony Brown was a surprise because he was not listed as a witness on the state's witness list. After Attorney Brown showed the statement to the

---

[2] Although § 53a-54c was amended in 2015; see Public Acts 2015, No. 15-211, § 3; the amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] The court file in the petitioner's criminal case, which was admitted as an exhibit at the habeas trial, indicates that jury selection in the case had begun and that the case was disposed of "[p]rior to [the] [c]ommencement of [t]rial."

petitioner, the state made a plea offer that was good for that day only. In light of the timing of the disclosure of Anthony Brown's statement, which was provided to Attorney Brown as soon as it was obtained, the prosecutor conveyed to Attorney Brown that he would not oppose a request for a continuance of trial. After discussions with Attorney Brown, the petitioner decided to enter a guilty plea, pursuant to the *Alford* doctrine,[4] to manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a. The court, *Alexander, J.*, canvassed the petitioner regarding her guilty plea, which it found to be knowing, intelligent and voluntary, accepted the plea, and sentenced the petitioner to a total effective term of incarceration of twenty years, five of which were mandatory, followed by five years of special parole. The petitioner did not appeal from her conviction.

The petitioner commenced the present habeas action in December, 2018. In her amended habeas petition, filed on December 12, 2022, the petitioner alleged two counts. In count one, she alleged that Attorney Brown provided ineffective assistance in a number of respects, including, inter alia, by failing to conduct a thorough investigation of her case, and by failing to meaningfully explain the plea offer and to advise her regarding her guilty plea.[5] In count two, she alleged that she was denied her due process right to a fair trial as a result of, inter alia, the

[4] See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[5] The petitioner's amended habeas petition includes twelve separate paragraphs alleging the various ways in which Attorney Brown's performance was deficient, some of which appear to overlap. In its memorandum of decision, the habeas court stated: "[The petitioner's] first count contains numerous allegations of deficient performance against Attorney Brown. Most of these allegations warrant little or no discussion because there was no evidence presented to support them. Furthermore, [the petitioner's] posttrial brief does not address these numerous claims and is devoid of any analysis. The court will deem those claims averred in the amended petition but not briefed to be abandoned. . . . Therefore, the court will only address the petitioner's claims to the extent substantiating evidence was presented and specifically briefed by the petitioner." (Citation omitted.) As a result, the court addressed only the petitioner's claims that Attorney Brown had performed deficiently

prosecutor's failure to disclose an agreed upon disposition and sentencing for Anthony Brown in a separate case in exchange for his written statement, in violation of *Brady*. A trial was held before the habeas court, *Wagner, J.*, on November 21, 2023, after which the habeas court rendered judgment denying the amended habeas petition. Specifically, the habeas court concluded that the petitioner had failed to demonstrate that Attorney Brown performed deficiently and that she was prejudiced by the alleged deficiency, and that the petitioner did not present evidence establishing a *Brady* violation. Thereafter, the court granted the petition for certification to appeal, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims that the habeas court improperly denied her amended habeas petition with respect to her claim of ineffective assistance of trial counsel. Specifically, the petitioner claims that the habeas court improperly concluded that she had failed to meet her burden of demonstrating that Attorney Brown provided ineffective assistance by failing to conduct an adequate investigation and to adequately advise her regarding the state's plea offer and her guilty plea, and that she was prejudiced by Attorney Brown's allegedly deficient performance. Before we address the merits of these claims, we first set forth our well settled standard

by failing to "properly prepare for trial" and to adequately advise her regarding the state's plea offer and her guilty plea.

On appeal, the petitioner challenges the habeas court's denial of her amended habeas petition only with respect to Attorney Brown's pretrial investigation and his alleged failure to properly advise the petitioner regarding the state's plea offer and her guilty plea. Because the petitioner neither raised nor briefed any claims on appeal concerning the other grounds of alleged deficient performance set forth in her amended habeas petition, and because those other grounds were never addressed by the habeas court, we similarly deem abandoned any claims relating to those other grounds. See, e.g., *Alston* v. *Commissioner of Correction*, 236 Conn. App. 568, 572 n.4, 349 A.3d 324 (2025) (deeming abandoned claims that were not raised or briefed on appeal), cert. denied, 354 Conn. 916, 351 A.3d 413 (2026).

of review in habeas matters and relevant legal principles governing claims of ineffective assistance of counsel. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong of the *Strickland* test, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Gusan* v. *Commissioner of Correction*, 231 Conn. App. 429, 446–47, 332 A.3d 959, cert. denied, 351 Conn. 931, 334 A.3d 483 (2025).

"In order for a petitioner to prevail on a claim of ineffective assistance on the basis of deficient performance,

he must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. . . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. . . .

"[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . Indeed, our Supreme Court has recognized that [t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Internal quotation marks omitted.)

*Johnson* v. *Commissioner of Correction*, 229 Conn. App. 577, 600–601, 327 A.3d 916 (2024), cert. denied, 351 Conn. 902, 329 A.3d 239 (2025).

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . Cases, such as the present case, in which the petitioner's conviction follows a guilty plea, are governed by *Hill* v. *Lockhart*, [474 U.S. 52, 58–60, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)], which modified the prejudice prong of the *Strickland* test to focus on the extent to which counsel's allegedly deficient performance affected the outcome of the plea process. In *Hill*, the Supreme Court explained: [T]he two-part [*Strickland*] test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the [*Strickland*] test is nothing more than a restatement of the standard of attorney competence . . . . The second, or prejudice, requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (Citation omitted; internal quotation marks omitted.) *Gusan* v. *Commissioner of Correction*, supra, 231 Conn. App. 447–48. "It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland-Hill* test], whichever is easier." (Internal quotation marks omitted.) Id., 447.

## A

The petitioner claims that Attorney Brown provided ineffective assistance by failing to investigate her case. She claims that Attorney Brown knew that she had been shot in May, 2007, and "that she had difficulty doing simple tasks such as holding a pen or writing and would not have been able to shoot a gun . . . [and] [y]et he did not remember if he subpoenaed her medical records." The

petitioner contends that, "[b]y failing to obtain medical records . . . Attorney Brown missed critical opportunities to be able to present exculpatory evidence, thereby undermining the petitioner's ability to establish her innocence," as "[t]he medical records . . . would have documented the extent of her injury and physical limitations, directly contradicting the prosecution's theory that she could have fired a weapon during the alleged crime . . . [and] could have raised serious doubt as to her physical capability to commit the offense[s] and provided a potential jury with an alternative narrative consistent with her innocence."[6] She also claims that Attorney Brown did not interview or subpoena witnesses and improperly "pawn[ed]" off that responsibility on his investigator, William Smith, that Smith contacted only one witness, and that neither Attorney Brown nor Smith spoke with or reached out to her family members. According to the petitioner, "[t]here was no reasonable explanation for Attorney Brown not to conduct a thorough investigation of the petitioner's case. He failed [the petitioner] by not providing for a thorough investigation."[7] We disagree.

The following additional facts are relevant to the petitioner's claim that Attorney Brown provided ineffective

[6] The respondent, the Commissioner of Correction, contends that we should decline to review any claim raised by the petitioner concerning Attorney Brown's alleged failure to subpoena her medical records because that claim is within the claims found by the habeas court to have been inadequately briefed and abandoned by the petitioner. See footnote 5 of this opinion. Because our review of the allegations of ineffective assistance of counsel in count one of the amended habeas petition demonstrates that many of the allegations appear to overlap, and because the habeas court did not specifically identify which particular paragraphs of count one it deemed abandoned and proceeded to review the petitioner's claim that Attorney Brown did not properly prepare for trial, which can include a failure to obtain medical records, we reject the respondent's claim that we should decline to review this aspect of the petitioner's claim.

[7] The petitioner also contends that Smith could not recall whether he ever spoke with Aaron Taylor, who purportedly "may have been subject to a third-party culpability claim." The petitioner called Taylor as a witness at the habeas trial, but he invoked his fifth amendment rights and did not testify. In her principal appellate brief, the petitioner provides no analysis or legal authority concerning third-party culpability

assistance by failing to investigate her case. At the petitioner's habeas trial, Attorney Brown was asked on direct examination whether he recalled interviewing any witnesses that he intended to call for trial, and he responded: "My investigator usually does that, so I don't recall. Although, there are occasions when I will, but I don't have a memory of that in this case." He testified that, prior to the beginning of jury selection, he discussed the case with the petitioner. Specifically, when asked whether he recalled "sitting down with [the petitioner] and going over witnesses that she thought [he] could call for the jury trial," he responded: "I remember . . . going through the discovery with her, myself and also in the presence of my investigator, and I do recall discussing witnesses, both witness statements . . . [or the potential] . . . state witnesses . . . as well as witnesses that we might be able to call . . . ." Attorney Brown could not recall whether any witnesses *were subpoenaed* for trial, as subpoenas are not always necessary. Attorney Brown also testified that he was aware that the petitioner had been shot in her right forearm prior to the incident underlying the charges against the petitioner,[8] and, although he could not recall whether he had subpoenaed any of the petitioner's medical records from Hartford Hospital, he testified that he did have the petitioner's medical records and reviewed them in preparation for trial. Attorney Brown further testified that the petitioner had denied that she was the shooter and wanted to proceed to trial up until the time when her cousin, Anthony Brown, provided his written statement to the prosecutor.

Attorney Brown testified that he had been practicing law for more than thirty years and had litigated

or how Taylor could have assisted her defense. We, therefore, decline to review any claim that Attorney Brown was deficient in this respect. See, e.g., *Karaoke Heroes NH, LLC* v. *RVRM Enterprises, LLC*, 237 Conn. App. 762, 771–72 n.13, A.3d (2026) (declining to review claim that was briefed inadequately, as "[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" (internal quotation marks omitted)).

[8] According to the petitioner's testimony, she had been shot on May 18, 2007, approximately three months prior to the victim's murder.

multiple murder trials. He also had represented the petitioner in a prior criminal matter.[9] With respect to the charges in the present case, Attorney Brown testified that they exposed the petitioner to more than 100 years of incarceration or to at least a life sentence, as the victim had been shot multiple times in his vehicle, execution style. Attorney Brown also acknowledged that some witnesses had selected the petitioner's photograph from a police photographic array, and he testified that he had explained the strengths and weaknesses of the state's case to the petitioner, as well as the evidence that the state had against her, the state's burden of proof, and the elements of the crimes, and that he had multiple discussions concerning those matters with the petitioner. According to Attorney Brown's testimony, if the petitioner had given him names of witnesses or an alibi, he would have had his investigator look into the witnesses and investigate the alibi.

Attorney Brown's investigator, Smith, also testified at the habeas trial. In his testimony, Smith recalled working on the petitioner's case and that he had been provided with discovery materials, which he reviewed with the petitioner, after which he investigated the case by looking for and speaking with potential witnesses. According to Smith, he was never given the name Anthony Brown to look into, and he recalled putting together a witness list and trying to find people, which he stated was "difficult." Specifically, Smith testified that, during his talks with the petitioner, she provided him with the names of approximately seven people who might be helpful to the case, and that, although he had attempted to speak with those individuals, he was unable to do so due to "[b]ad addresses," calls not being returned or because he could not find them, despite his efforts to do so. Smith recalled talking to one person in this case,

---

[9] The petitioner testified that, in the prior case, she had been accused of shooting Arnold Gayle and that the case ultimately was nolled. She also testified that she specifically had requested that Attorney Brown represent her in the present case because she "knew him and . . . trusted [him]."

namely, the petitioner's girlfriend. Smith further testified that any potential alibi witnesses would have come from the petitioner, that no such alibi witnesses had been provided to him, and that, if the petitioner had provided any alibi witnesses, he would have attempted to track down those witnesses. Smith acknowledged that he did not contact or speak with any police officers in the case but explained that the police had no obligation to speak with him. Finally, Smith testified that he did not serve any subpoenas in this case because, at that time, he was not allowed to do so under Connecticut law.

The petitioner's sister, Ashiya Walcott, testified that, prior to the scheduled trial date for the petitioner, Attorney Brown never contacted her to talk about what she knew about the case and that she never spoke with Smith. She also testified regarding the gunshot wound to the petitioner's arm, stating that the petitioner was always complaining that she could not pick up a pencil or write and that it was painful when the petitioner did certain things with the injured arm.

The petitioner testified that, after she was shot in May, 2007, she was at a hospital almost every week, that her arm was in a cast, and that, when the cast was removed, she attended physical therapy four or five times per week because her "arm was messed up." She also testified that she never had surgery on her arm because she was incarcerated in 2008 and again in 2012, and that, as a result, she has "a deformed arm." Following this testimony, the petitioner's counsel offered into evidence the petitioner's medical records from Hartford Hospital. The prosecutor objected, arguing, inter alia, that nothing in the records demonstrated that the petitioner was incapable of firing a gun in August, 2007. The court overruled the objection and found that it concerned the weight to be afforded the evidence, not its admissibility. The court admitted the medical records into evidence, limited only to those records from the date of when the petitioner was shot in May, 2007, up until the date of the shooting of the victim in the present case.

In its memorandum of decision denying the amended habeas petition, the habeas court stated: "[The petitioner] argues that she has demonstrated . . . that Attorney Brown did not properly prepare for trial and did not investigate the 'surprise witness' Anthony Brown. . . . [A] claim that counsel failed to investigate must be supported by affirmative evidence, such as testing that was relied upon being flawed, testimonial statements lacking credibility, or exculpatory evidence having been overlooked, and not 'grounded in speculation that, if the petitioner's counsel had conducted an additional and possibly redundant investigation, he *might have* discovered exonerating evidence.' . . . Attorney Brown had an investigator who met with [the petitioner] and conducted an investigation based on the information she provided. The testimony from Attorney Brown and . . . Smith does not establish any failures to investigate. Smith credibly testified that he conducted an investigation based on the information provided to him by [the petitioner], whose own testimony shed no light on other potential witnesses or alibi information that investigative efforts should have uncovered. Both Attorney Brown and Smith noted that [the petitioner] did not provide them with either an alibi or alibi witnesses. [The petitioner] presented no evidence from a potential trial witness aside from her sister, Ashiya Walcott, whose testimony neither establishes an alibi nor a defense. To the extent [that the petitioner's] evidence attempted to show that she was unable to fire the shots that killed the victim, the court is unconvinced that [the petitioner's] injury to her right forearm in May, 2007, precluded her from firing a weapon in August, 2007." (Citations omitted; emphasis in original; footnote omitted.)

The following legal principles guide our analysis of this claim. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made

all significant decisions in the exercise of reasonable professional judgment. . . .

"Inasmuch as [c]onstitutionally adequate assistance of counsel includes competent pretrial investigation . . . [e]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case. . . . [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . .

"The reasonableness of counsel's actions may be determined or substantially influenced by the [petitioner's] own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]. In particular, what investigation decisions are reasonable depends critically on such information. . . .

"Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it. . . . Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Emphasis omitted; internal quotation marks omitted.) *Owen* v. *Commissioner of Correction*, 234 Conn. App. 481, 496–97, 344 A.3d 158, cert. denied, 353 Conn. 923, 345 A.3d 812 (2025).

"[T]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . The United States Supreme Court has cautioned

that a reviewing court, in considering whether an attorney's performance fell below a constitutionally acceptable level of competence pursuant to the standards set forth herein, must properly apply the strong presumption of competence that *Strickland* mandates and is required not simply to give [trial counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons [that] counsel may have had for proceeding as [he] did. . . . This strong presumption of professional competence extends to counsel's investigative efforts . . . as well as to choices made by counsel regarding what defense strategy to pursue. . . .

"It is [also] well established that the burden of establishing grounds for relief in a habeas corpus proceeding rest[s] with the petitioner. . . . The petitioner, as the plaintiff in a habeas corpus proceeding, bears a heavy burden of proof. . . . [I]t is well established that a petitioner in a habeas proceeding cannot rely on mere conjecture or speculation . . . but must instead offer demonstrable evidence in support of his claim. . . .

"It is equally well established that the [habeas] court, as the trier of fact, [is] the sole arbiter of facts and credibility and [is] free to believe in whole or in part the [witness'] testimony. . . . The court also [is] free to draw reasonable inferences from that testimony when rendering judgment." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 498–99.

To the extent the petitioner claims that Attorney Brown did not conduct any investigation of her case, we conclude that the record belies any such claim. The record supports the habeas court's finding that "[t]he testimony from Attorney Brown and . . . Smith does not establish any failures to investigate." The habeas court specifically credited Smith's testimony "that he conducted an investigation based on the information provided to him by [the petitioner], whose own testimony shed no light on other potential witnesses or alibi information that investigative efforts should have uncovered." As we have stated, "[t]he habeas judge, as the trier of facts, is the

sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . Appellate courts do not second-guess the trier of fact with respect to credibility." (Internal quotation marks omitted.) *Nealy* v. *Commissioner of Correction*, 235 Conn. App. 872, 885, 346 A.3d 551, cert. denied, 353 Conn. 939, 347 A.3d 879 (2025). "A pure credibility determination made by a habeas court is *unassailable*." (Emphasis in original; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 228 Conn. App. 701, 715, 324 A.3d 837, cert. denied, 350 Conn. 929, 326 A.3d 250 (2024). Moreover, the petitioner has not provided any legal authority in support of her contention that it was improper for Attorney Brown to utilize the services of an investigator to assist with the petitioner's case, and we cannot conclude that, by doing so, Attorney Brown provided representation that "fell below an objective standard of reasonableness as measured by prevailing professional norms." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 229 Conn. App. 600. Accordingly, the petitioner's claim that Attorney Brown provided ineffective assistance by failing to investigate her case lacks merit.

We also find the petitioner's claim unavailing to the extent that she alleges that Attorney Brown's investigation was inadequate. As we previously noted, the habeas court credited Smith's testimony that he had investigated any information or names provided to him by the petitioner but that he was unsuccessful in actually contacting most of the individuals. Moreover, the habeas court found that "[b]oth Attorney Brown and Smith noted that [the petitioner] did not provide them with either an alibi or alibi witnesses. [The petitioner] presented no evidence from a potential trial witness aside from her sister, Ashiya Walcott, whose testimony neither establishes an alibi nor a defense." The petitioner, either through her own testimony or that of the witnesses presented at the habeas trial, did not direct the habeas court to any evidence that should have been discovered by Attorney Brown or Smith had they investigated her

case further. Notably, she does not argue on appeal that Attorney Brown was deficient in failing to discover that Anthony Brown had information implicating the petitioner in the victim's death. Furthermore, to the extent the petitioner claims that Attorney Brown was deficient by not contacting any of her family members, she, again, has failed to demonstrate why his failure to do so constituted deficient performance. The only family member to testify at the petitioner's habeas trial was her sister, Ashiya Walcott, and the habeas court properly found that her testimony did not establish an alibi or a defense. Additionally, the petitioner presented no evidence demonstrating that she had informed Attorney Brown or Smith that Ashiya Walcott had exculpatory information and could be of assistance to her defense, or of any other family members who should have been contacted or as to what information could have been discovered had those family members been contacted.

Finally, the petitioner's claim that Attorney Brown was deficient in failing to obtain her medical records, which she argues "could have raised serious doubt as to her physical capability to commit the offense," is undermined by the testimony of Attorney Brown that, although he could not recall subpoenaing the medical records, he did have the records and reviewed them prior to the date when trial was to commence and the petitioner entered her guilty plea. Moreover, the habeas court was not persuaded by the evidence presented by the petitioner that attempted to show that she was unable to fire the gunshots that killed the victim. Indeed, the court's determination that Attorney Brown did not perform an inadequate investigation of the petitioner's case was based in large part on its assessment of the credibility of the witnesses and evidence presented. It is not for this court to reweigh the evidence or to second-guess the habeas court's assessment of the evidence presented at the habeas trial. See, e.g., *Roman* v. *Commissioner of Correction*, 223 Conn. App. 111, 126, 307 A.3d 934 (2023) ("it is not our role to reweigh the evidence adduced

at the habeas trial"), cert. denied, 348 Conn. 952, 308 A.3d 1039 (2024).

"[A]lthough it is incumbent on a trial counsel to conduct a prompt investigation of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction . . . counsel need not track down each and every lead or personally investigate every evidentiary possibility." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 285 Conn. 585, 598–99, 940 A.2d 789 (2008). As we have stated, "a petitioner in a habeas proceeding cannot rely on mere conjecture or speculation . . . but must instead offer demonstrable evidence in support of his claim." (Internal quotation marks omitted.) *Owen* v. *Commissioner of Correction*, supra, 234 Conn. App. 498–99. In the present case, we conclude that the petitioner has not demonstrated that Attorney Brown failed to conduct a reasonable investigation of her case. We further conclude that her claims on appeal are based on speculation that "[k]ey witnesses *might have* provided exculpatory statements," rather than on demonstrable evidence. (Emphasis added.) The evidence before the habeas court shows that both Attorney Brown and Smith met with the petitioner to discuss her case and potential witnesses, and that Smith performed an investigation based on the information provided to him by the petitioner. Although Smith was not able to contact many of the individuals whose names had been provided to him by the petitioner, the petitioner did not present any of those witnesses at the habeas trial, let alone show what information those witnesses may have had that would have been helpful to her case. See, e.g., *Tatum* v. *Commissioner of Correction*, 66 Conn. App. 61, 66–71, 783 A.2d 1151, cert. denied, 258 Conn. 937, 785 A.2d 232 (2001). Accordingly, the petitioner failed to meet her burden of demonstrating that Attorney Brown performed deficiently in his investigation of her case. See *Clinton S.* v. *Commissioner of Correction*, 174 Conn. App. 821, 836, 167 A.3d 389 ("[t]he burden to demonstrate what benefit additional investigation would have revealed is

on the petitioner" (internal quotation marks omitted)), cert. denied, 327 Conn. 927, 171 A.3d 59 (2017).

B

Next, we turn to the petitioner's claim that Attorney Brown performed deficiently by failing to adequately advise her regarding the state's plea offer and her guilty plea. The petitioner contends that, because Attorney Brown "failed to conduct a thorough investigation, [he] failed to make an informed evaluation of the options to determine whether [she] should have plead[ed] guilty or continued with her fight to prove her innocence." According to the petitioner, she "wanted to go to trial" and "was dressed and ready to go to trial" when she was presented with the plea offer from the state after it had obtained the written statement from Anthony Brown. She further asserts that, "had Attorney Brown done a thorough investigation, he would not have urged her to take the plea on the basis [that] she would still be young upon release," and that she argued with Attorney Brown when he urged her to take the plea offer and "felt ambushed." She contends that Attorney Brown failed her because "he was unaware of what else there was because . . . he failed to conduct a thorough investigation."

The petitioner's briefing on this aspect of her ineffective assistance of counsel claim is scant and is based primarily on her claim that Attorney Brown failed to conduct a thorough investigation of her case, which we already have rejected. Accordingly, to the extent the petitioner's claim is premised on her assertion that Attorney Brown failed to adequately investigate her case, the claim fails for the reasons stated in part I A of this opinion.

We address the petitioner's claim insofar as she asserts that Attorney Brown's advice regarding whether she should accept the plea offer and plead guilty was deficient, apart from his alleged failure to thoroughly investigate. The following additional facts are relevant to our analysis.

At the habeas trial, Attorney Brown testified that, after he was given a copy of Anthony Brown's written statement, he brought it to the petitioner and reviewed it with her. He further testified: "My advice was that I thought that the state's case was not very good. I wouldn't say it was poor, but that, with that statement, if the jury believed that statement, that we would lose. If the jury [did] not believe that statement or [was] unsure whether [it] believed that statement, I still thought there was a good chance, not a certainty, obviously, that we would prevail. And my advice was that [the petitioner] should seriously consider it. I did not tell [the petitioner] to take it. I'm not in the habit of doing that unless someone's very young, you know, or some other factors [are] involved. But I made it clear that, if the jury believed that statement combined with everything else, that I [thought the petitioner would] lose. And if . . . the jury believed it, [the petitioner] would clearly get, in my view, well, certainly would have to get more time because twenty-five is the mandatory minimum, but it would be much more than that based upon a lot of factors." Attorney Brown testified that the plea offer of twenty years to serve, with five years of special parole, was "a very advantageous offer" given that the petitioner was exposed to more than 100 years of incarceration on the charges against her in the event of a conviction after trial . Attorney Brown also discussed with the petitioner the rights that she was giving up by pleading guilty, including the right to a trial, the right to cross-examine witnesses and the right to present her own witnesses, as well as the fact that the plea deal was binding.

A transcript of the trial court's canvass of the petitioner regarding her guilty plea to manslaughter in the first degree with a firearm was admitted into evidence at the habeas trial. The transcript reveals that, during the plea canvass, the petitioner answered affirmatively when asked whether she had spoken with Attorney Brown about her decision to enter a guilty plea rather than continue with a trial, understood the rights that she was giving up by pleading guilty, was entering the plea of her

own free will, and recognized that, if she risked going to trial, she could be convicted of the greater offense of murder. The petitioner also represented that she had not taken any alcohol, medicine or drugs that would have made her unable to understand the court, that no one was forcing or threatening her to enter the guilty plea, and that she did not need to ask Attorney Brown anything else about the plea agreement before it was accepted by the court. The trial court found the petitioner's guilty plea "to be voluntarily [and] knowingly made, [with] a factual basis . . . and . . . the assistance of competent counsel."

At the habeas trial, the petitioner testified that, on the day that trial was to commence, she was "in a suit" and "ready to go to trial" when Attorney Brown "ambushed [her] with [the] statement from [Anthony Brown]." She testified that, after being presented with the state's plea offer, she had an argument with Attorney Brown because she "still wanted to go to trial." The petitioner acknowledged that the trial court asked her a number of questions before she entered her guilty plea but stated: "Yeah, but at the end of the day, I wasn't prepared for that, that day. So, like I said, I was ambushed and my attorney . . . he's telling me to take the time because I'll be young when I get out of jail. Saying stupid stuff like that and not doing what I'm telling him to do because I'm telling him, like, if they wrote this statement today, don't it look funny? Argue it. Everything you got, argue it. I was going to fire him and do it myself to tell you the truth. It's that simple. He didn't listen to me. He argued with me. He's in the cell with me with a statement, four page statement, telling me, oh, just take it, you can get this, blah, blah, blah, like—and that's not what I came here for. I'm already in a suit. I'm ready to go to trial. I [had] been ready to go to trial." She testified that she pleaded guilty because her "back was against the wall" and she "[had] no choice."

With respect to this claim, the habeas court stated in its memorandum of decision: "As to the allegation that Attorney Brown failed to meaningfully explain the plea

offer to [the petitioner] and failed to advise her about the same and ensure that she understood the strength of the state's evidence, the elements of the offense, potential defenses, the chance of acquittal and actual exposure upon a conviction of all offenses charged, the court finds that the credible evidence demonstrates that Attorney Brown's advice was not deficient. . . . In the present case, two anonymous eyewitnesses had identified [the petitioner] in photo[graphic] arrays. It is unclear how the police developed Anthony Brown as a potential witness, but he provided a statement that implicated [the petitioner] just as she was ready to begin the jury trial. The state immediately disclosed and shared Anthony Brown's statement with the defense. Attorney Brown discussed with [the petitioner] the defense's case in the significantly altered dynamic of Anthony Brown's statement and likely testimony. The state was amenable to a continuance of trial so that the defense could prepare for trial given the late development of Anthony Brown as a state's witness. Attorney Brown testified credibly that he did not specifically recommend to [the petitioner] that she accept the guilty plea. Thus, the evidence establishes that [the petitioner] herself decided to forgo a trial and the now significantly heightened risk of a murder conviction with the potential of a sentence of more than 100 [years of] incarceration. [The petitioner] failed to adduce evidence in the habeas case that shows what the defense would have done at trial to attack or undermine Anthony Brown's likely testimony had Attorney Brown investigated Anthony Brown further. The court concludes, therefore, that [the petitioner] has failed to prove that Attorney Brown's plea advice was deficient." (Citations omitted; emphasis omitted.)

Our case law directs that, "[i]n the context of a plea bargain, [a] defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable. . . . Although the defendant ultimately must decide whether to accept a plea offer or proceed to trial, this critical decision, which in many instances will affect a defendant's liberty,

should be made by a represented defendant with the adequate professional assistance, advice, and input of his or her counsel. Counsel should not make the decision for the defendant or in any way pressure the defendant to accept or reject the offer, but counsel should give the defendant his or her professional advice on the best course of action given the facts of the particular case and the potential total sentence exposure. . . . We are mindful that [c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness . . . . Accordingly, [t]he need for recommendation depends on countless factors, such as the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial compared to the guilty plea . . . whether [the] defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform [his] plea decision." (Citations omitted; internal quotation marks omitted.) *Carrasquillo* v. *Commissioner of Correction*, 206 Conn. App. 195, 205–206, 259 A.3d 1182, cert. denied, 339 Conn. 907, 260 A.3d 1227 (2021).

Our thorough review of the record in this case demonstrates that the habeas court properly determined that the petitioner had failed to establish her claim that Attorney Brown did not meaningfully explain the plea offer to her or advise her regarding her guilty plea. Attorney Brown testified that he had explained the strengths and weaknesses of the state's case to the petitioner, as well as the evidence that the state had against her, the state's burden of proof, and the elements of the crimes, and that he had multiple discussions concerning those matters with the petitioner. He also testified that he had a discussion with the petitioner regarding her case in light of the statement provided by Anthony Brown, including his opinion that, if the jury believed Anthony Brown, the petitioner likely would lose the case if they went to trial, thereby subjecting her to a significantly increased potential sentence of more than 100 years of incarceration. As a result, Attorney Brown considered the state's offer of

twenty years to serve, followed by five years of special parole, to be an "advantageous" offer. Attorney Brown also testified that he had discussed with the petitioner the rights that she was giving up by pleading guilty, including the right to a trial, the right to cross-examine witnesses and the right to present her own witnesses, as well as the fact that the plea deal was binding. In reaching its decision that Attorney Brown's advice regarding the plea offer and the petitioner's guilty plea was not deficient, the habeas court specifically credited Attorney Brown's testimony, including his testimony that he did not specifically recommend to the petitioner that she accept the plea offer. See *Carrasquillo* v. *Commissioner of Correction*, supra, 206 Conn. App. 209 ("there is no requirement that counsel specifically recommend that the petitioner accept a plea offer"). "[W]e must defer to the [habeas court's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Leach* v. *Commissioner of Correction*, 211 Conn. App. 663, 671, 273 A.3d 739 (2022). In light of that credibility determination, the habeas court implicitly rejected the petitioner's testimony that Attorney Brown kept telling her to take the deal[10] and made a finding that the petitioner, herself, had made the decision to accept the plea offer.

We conclude, in light of the habeas court's factual findings, which were premised on its credibility assessment of Attorney Brown's testimony, that the record supports

---

[10]The habeas court also implicitly rejected the petitioner's testimony that her "back was against the wall" and that she "[didn't] have no choice" but to plead guilty. Any such claim by the petitioner is contradicted by the transcript of the petitioner's plea canvass, which establishes that she spoke with Attorney Brown about her decision to enter a guilty plea, understood the rights that she was giving up by pleading guilty, was entering the plea of her own free will, and was not being forced or threatened by anyone to enter the guilty plea. See *James P.* v. *Commissioner of Correction*, 224 Conn. App. 636, 650, 312 A.3d 1132 ("[a] court is permitted to rely upon a defendant's answer given in response to a plea canvass" (internal quotation marks omitted)), cert. denied, 349 Conn. 911, 314 A.3d 603 (2024).

the habeas court's determination that the petitioner had failed to establish that Attorney Brown's plea advice was deficient. Therefore, the petitioner has not demonstrated that Attorney Brown's plea advice fell below an objective standard of reasonableness; see *O'Reagan* v. *Commissioner of Correction*, 211 Conn. App. 845, 864, 274 A.3d 189 ("the petitioner failed to meet his burden to overcome the presumption that [his trial counsel] provided competent advice with regard to his guilty plea"), cert. denied, 343 Conn. 926, 275 A.3d 1213 (2022); and her claim of ineffective assistance of counsel regarding her guilty plea fails.[11]

## II

The petitioner claims that the habeas court improperly determined that she failed to establish her claim, as set forth in count two of her amended habeas petition, that she was denied due process as a result of the state's violation of *Brady* "prior to and/or during jury selection . . . ."[12] Specifically, she claims that the habeas court

---

[11] The petitioner also claims that she was prejudiced by the allegedly deficient performance of Attorney Brown. We need not reach this claim in light of our conclusions in parts I A and B of this opinion that the plaintiff failed to establish her claims that Attorney Brown performed deficiently. "This court has repeatedly explained that a court may resolve ineffective assistance of counsel claims on either the performance prong or the prejudice prong. See, e.g., *Soto* v. *Commissioner of Correction*, [215 Conn. App. 113, 120, 281 A.3d 1189 (2022)]. Because we have determined that the habeas court properly concluded that the petitioner's ineffective assistance of counsel claim failed under the performance prong of the *Strickland-Hill* test, we need not reach the petitioner's evidentiary claim as it relates to the prejudice prong of that test. See, e.g., *Quint* v. *Commissioner of Correction*, 211 Conn. App. 27, 36 n.7, 271 A.3d 681 ('[i]n light of our determination that the petitioner failed to establish that [counsel's] performance was deficient, we need not address the prejudice prong'), cert. denied, 343 Conn. 922, 275 A.3d 211 (2022); *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 818 n.7, 194 A.3d 316 ('[w]hen a petitioner has failed to meet the performance prong of *Strickland*, we need not reach the issue of prejudice' . . .)), cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018)." *Williams* v. *Commissioner of Correction*, 223 Conn. App. 745, 762–63, 310 A.3d 381, cert. denied, 349 Conn. 901, 312 A.3d 586 (2024).

[12] In her amended habeas petition, the petitioner alleged a number of ways in which the state allegedly violated *Brady*, including by

improperly denied her claim of a *Brady* violation on the ground that she had failed to show the existence of an undisclosed agreement between the state and Anthony Brown in exchange for Anthony Brown's written statement and likely testimony against the petitioner. The petitioner contends that the evidence demonstrates that

"conceal[ing] favorable evidence from the petitioner . . . [and] failing to disclose a promised or agreed upon disposition and sentencing for the state's witnesses prior to and/or during jury selection," by "fail[ing] to correct false statements of its witnesses against the petitioner," and by "fail[ing] to notify the petition[er] and her counsel of a witness Anthony Brown and/or fail[ing] to deliver an incriminating statement allegedly drafted by Anthony Brown after jury selection and on the day evidence was to begin." Aside from making one passing assertion that the prosecutor was aware of Anthony Brown as a witness, without any further analysis or citation to authority regarding the timeliness of the prosecutor's disclosure of Anthony Brown's statement, the petitioner on appeal challenges only the habeas court's determination that she had failed to demonstrate the existence of an undisclosed agreement between the state and Anthony Brown. Accordingly, we deem abandoned any claims not raised or briefed with proper citation to legal authority and analysis. See, e.g., *Reynolds* v. *Commissioner of Correction*, 229 Conn. App. 228, 230–31, 325 A.3d 1214 (2024) ("because the petitioner has not raised or adequately briefed any claim that directly challenges the judgment of conviction from which he took this appeal, we deem any possible claims abandoned"). We note, nevertheless, that the habeas court specifically found that, upon obtaining the statement from Anthony Brown, the prosecutor "immediately disclosed" it to Attorney Brown, who testified to that effect and that he had no reason to believe that the prosecutor had withheld information about Anthony Brown as a witness. The habeas court found that Attorney Brown had testified credibly, and we are not at liberty to disregard the court's credibility assessment of that testimony. See, e.g., *Dixon* v. *Commissioner of Correction*, 233 Conn. App. 851, 861, 342 A.3d 260 ("[t]he court's decision to credit [trial counsel's] testimony . . . is one we cannot disturb), cert. denied, 353 Conn. 918, 345 A.3d 808 (2025); *Williams* v. *Commissioner of Correction*, 223 Conn. App. 745, 762, 310 A.3d 381 ("[t]his court will not revisit [a habeas court's] credibility determination on appeal"), cert. denied, 349 Conn. 901, 312 A.3d 586 (2024).

Furthermore, the petitioner alleged in count two of her amended habeas petition that her due process rights to a fair trial were violated under the sixth and fourteenth amendments to the federal constitution, and under article first, § 8, of the Connecticut constitution. On appeal, the petitioner has not provided any analysis of her claim under our state constitution. We, therefore, also deem any such claim abandoned. See *Bobe* v. *Commissioner of Correction*, 237 Conn. App. 172, 183 n.9, 351 A.3d 14 (because petitioner did not include separate state constitutional

there was an understanding "that, if Anthony Brown was willing to provide a statement incriminating the petitioner . . . he would receive a benefit on his charges." To provide context for the petitioner's *Brady* claim, we first set forth the following relevant legal principles.

"[T]he law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . .

"It is well established that [i]mpeachment evidence as well as exculpatory evidence [fall] within *Brady*'s definition of evidence favorable to an accused. . . . [An express or implied] plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady* . . . ." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 174 Conn. App. 776, 795, 166 A.3d 815, cert. denied, 327 Conn. 957, 172 A.3d 204 (2017).

"The prerequisite of any claim under . . . *Brady* . . . is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error. . . .

"[T]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the

analysis in his brief, he abandoned any separate claim he may have had under state constitution), cert. denied, 354 Conn. 922,    A.3d    (2026).

jury's assessment of the credibility of a significant prosecution witness. . . . Because a plea agreement is likely to bear on the motivation of a witness who has agreed to testify for the state, such agreements are potential impeachment evidence that the state must disclose. . . .

"Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of *a fair trial . . . .*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 796–97.

"Our Supreme Court has recognized that evidence that merely *suggests* an informal understanding between the state and a state's witness may constitute impeachment evidence for purposes of *Brady*. *State* v. *Floyd*, 253 Conn. 700, 740, 756 A.2d 799 (2000). Such evidence is by no means limited to the existence of plea agreements. Any . . . understanding or agreement between any state's witness and the state police or the state's attorney clearly falls within the ambit of *Brady* principles." (Emphasis in original; internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, supra, 174 Conn. App. 798.

"The question of whether there existed an agreement between [a witness] and the state is a question of fact . . . . When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed. . . . This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . A petitioner bears the burden of proving the existence of an agreement between the state or police and a state's witness." (Internal quotation marks omitted.) Id., 798–99.

The following additional facts are relevant to this claim. Attorney Lucas Watson, who had represented Anthony Brown in a separate criminal matter, testified at the petitioner's habeas trial concerning the circumstances surrounding Anthony Brown's statement. In particular, Attorney Watson testified that he represented Anthony Brown in 2015 in a case involving a number of criminal charges, including, inter alia, criminal possession of a firearm[13] and risk of injury to a child. Anthony Brown ultimately pleaded guilty to carrying a dangerous weapon and received a sentence of three years of incarceration, execution suspended, with three years of conditional discharge. Attorney Watson testified that he had been approached by a prosecutor and asked whether Anthony Brown, whose case was pending at the time, wanted to meet with the prosecutor, but Anthony Brown declined the offer to meet, and Attorney Watson conveyed that to the prosecutor who had approached him. Subsequently, on the Sunday before April 28, 2015, Attorney Watson received a voicemail from the prosecutor in the petitioner's case in which the prosecutor stated, "we understand you are representing Anthony Brown." Attorney Watson returned the prosecutor's call, and

---

[13]The firearm at issue in Anthony Brown's case was an AR-15. Attorney Watson testified that the firearm belonged to Anthony Brown's wife, who had "purchased the parts for the firearm, pieced it together back . . . in [Las] Vegas, and then load[ed] it up and brought it all the way to Connecticut with them. . . . [Anthony Brown] had no association, no nothing with that firearm."

they had a discussion regarding Anthony Brown and his availability. During that conversation, the prosecutor stated, "we understand your guy has this case," to which Attorney Watson replied that Anthony Brown's case was not "going anywhere because there were some things in his case to where it started to fall apart." When Attorney Watson informed Anthony Brown that the prosecutor in the petitioner's case wanted to speak with him, Anthony Brown agreed to meet with the prosecutor.

Thereafter, on April 28, 2015, Attorney Watson and Anthony Brown met with the prosecutor in the petitioner's case, at which time Anthony Brown provided a written statement indicating that he had had two phone conversations with the petitioner in which she admitted to killing someone: one in late August or early September, 2015, in which the petitioner told Anthony Brown that she had killed someone behind her mother's house near Bulkeley High School in Hartford and that she wanted to come to Las Vegas where Anthony Brown was living at the time, and a second phone conversation about one week later in which the petitioner stated that she needed a place to "lay low until things calm[ed] down" because she had killed someone.

Attorney Watson acknowledged that the prosecutor wanted Anthony Brown to testify against the petitioner but could not recall whether there was any mention of a reward or some kind of consideration being given to Anthony Brown for his cooperation. Attorney Watson testified that "there was no written proffer agreement. No written, hey, we're going to go ahead and help your guy with this or do this for him or something like that. So, what [ended] up happening is, [Anthony Brown] gave the statement, and the minute he gave the statement, [the prosecutor] then ran up to [Attorney Brown] in the courtroom and . . . gave the statement to [Attorney Brown]." As a result of the petitioner's guilty plea, Anthony Brown did not need to testify.

With respect to Anthony Brown's plea deal, Attorney Watson testified that, during a meeting with the court, *Alexander, J.*, the prosecutor from the petitioner's case had explained the facts underlying Anthony Brown's case, that Anthony Brown had provided a statement in the petitioner's case, and that "the state was prepared to substitute the charge out to something different [in Anthony Brown's case].[14] From what [Attorney Watson] could recall, Judge Alexander had asked [the prosecutor] what [he wanted] to do with [Anthony Brown's case], at which point in time Judge Alexander . . . gave the recommended sentence . . . ." (Footnote added.) Attorney Watson later confirmed in his testimony that the offer of three years, execution suspended, with three years of conditional discharge had been made by Judge Alexander. Attorney Watson explained that, because Anthony Brown wanted to return to Las Vegas and feared for his life as a result of his statement against the petitioner, the deal was structured with conditional discharge, rather than probation, and Anthony Brown was put in a hotel, provided with witness protection, and was gone the next day.[15] Attorney Watson testified that Anthony Brown's case was weak and had been "falling apart" at the time of his plea deal because the charges brought against him

[14]The court file in Anthony Brown's case indicates that the date of his guilty plea was May 1, 2015, three days after Anthony Brown provided his statement in the petitioner's case. See *Papantoniou* v. *Commissioner of Correction*, 235 Conn. App. 674, 691 n.15, 346 A.3d 985 (2025) ("[i]t is well established that an appellate court may take judicial notice of court files in other cases").

[15]When Attorney Watson was asked whether the sentence given to Anthony Brown was consistent with "what similar cases would go for in Hartford at that time," Attorney Brown explained that it was "consistent with the fact that [Anthony Brown was] not going to be here any longer" but that it was "not consistent with the charge." Specifically, Attorney Watson testified that, "[n]ormally, the standard in cases such as [Anthony Brown's] or just cases involving guns, it's some sort of minimal jail time, especially, given the fact that he had a felony record. But this was a case where, you know, he could've got [three years of incarceration, execution suspended, with three years of probation] if he was going to stay here in Hartford or in Connecticut, but because he was going back to [Las] Vegas," the petitioner's sentence was structured to provide for conditional discharge, rather than probation.

were based on allegations that were found to be false. The petitioner did not call Anthony Brown as a witness at the habeas trial.

In its memorandum of decision, the habeas court concluded: "According to Attorney Watson, the state wanted Anthony Brown to testify against [the petitioner]. Attorney Watson, however, could not recall the state giving Anthony Brown any consideration in exchange for the statement, nor was there a written agreement about the state helping Anthony Brown. The statement and [the petitioner's] guilty plea led to discussions between the court and counsel. Anthony Brown then pleaded guilty to charges in a substitute information and accepted a court-recommended sentence. Based on the evidence adduced at the habeas trial, it appears that Anthony Brown pleaded guilty because he did not want his wife to have any criminal sentence exposure.[16] Anthony Brown also wanted to return to Las Vegas and had safety concerns once he gave his statement implicating [the petitioner]. The sentence he received—three years [of incarceration], [execution] suspended, with three years [of] conditional discharge—allowed Anthony Brown to do just that. Although Anthony Brown clearly benefited from his cooperation, there is no evidence of any formal agreement between him and the state.

"[The petitioner's] posttrial brief argues that the state withheld exculpatory evidence favorable to [the petitioner] and improperly concealed evidence from her by failing to disclose Anthony Brown's statement. It remains entirely unknown how and when the state developed Anthony Brown as a witness against [the petitioner]. The evidence establishes that, upon the state obtaining Anthony Brown's statement, the state immediately disclosed it to Attorney Brown, who discussed it with [the petitioner]. The state was willing to continue the trial so that the defense could investigate and prepare for trial given that late disclosure.

[16] This stemmed from the fact that the AR-15 belonged to Anthony Brown's wife. See footnote 13 of this opinion.

"In support of her contention that her right to due process was violated, [the petitioner's] posttrial brief refers to the state's witness list, which did not disclose Anthony Brown. The credible evidence supports the conclusion that the state apparently was unaware of the evidence Anthony Brown would provide until he gave his statement. When confronted with her cousin's incriminating statement, [the petitioner], who was on the cusp of her jury trial, chose to forgo the trial, plead guilty to manslaughter, and receive a significantly reduced sentence.

"What is lacking is any affirmative evidence showing that the state and Anthony Brown had an actual agreement disclosable to the defense. It is unknown from the evidence how and when the state became aware of Anthony Brown as a potential state's witness, as well as when he was arrested and the offense date for his charges. According to the evidence adduced at trial, the state immediately made the defense aware of Anthony Brown as a state's witness and disclosed his statement immediately upon taking it. The court concludes that [the petitioner] has not presented any evidence establishing a *Brady* violation. There is no evidence favorable to the defense that was suppressed by the state, either inadvertently or wilfully. Therefore, the claim in count two must be denied." (Footnote added.)

On appeal, the petitioner claims that the habeas court improperly denied her "claim of a *Brady* violation on the ground [that she had] failed to show that the state and Anthony Brown had an actual agreement disclosable to the defense." She asserts that "the state failed to disclose a promised or agreed upon disposition and sentencing for [Anthony Brown] . . . ." She further contends that Anthony Brown, "who was facing a felony gun charge for having an AR-15 [and other charges] . . . was saving himself at her expense by agreeing to provide a statement in exchange for lesser charges," and that "it was understood that, if Anthony Brown was willing to provide a statement incriminating the petitioner . . . he would receive a benefit on his charges." In support

of this claim, she relies on the testimony of Attorney Watson that, because Anthony Brown's case involved a gun, it was not likely to be nolled and Anthony Brown likely would have to serve minimal jail time. According to the petitioner, the prosecutor in her case previously had attempted, unsuccessfully, to obtain a statement from Anthony Brown, but once charges were brought against Anthony Brown, Anthony Brown agreed to provide a statement.

In his appellate brief, the respondent, the Commissioner of Correction, argues that no cooperation agreement existed between the prosecutor in the petitioner's case and Anthony Brown, and that, even if such a cooperation agreement did exist, its nondisclosure prior to the petitioner entering her guilty plea did not constitute a *Brady* violation. In support of the latter argument, the respondent relies on *United States* v. *Ruiz*, 536 U.S. 622, 633, 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002), in which the United States Supreme Court held that "the [c]onstitution does not require the [g]overnment to disclose material impeachment evidence prior to entering a guilty plea agreement with a criminal defendant." In other words, the respondent argues that the requirements of *Brady* do not apply to the present case, in which the petitioner entered a guilty plea instead of going to trial.[17]

We need not address whether the habeas court improperly concluded that the petitioner did not establish a

[17] Although the respondent did not specifically refer to *Ruiz* in his posttrial brief, he did argue in that brief that, "[f]irst and foremost, the respondent . . . notes that there was no jury trial. Ergo, any claim of failure to disclose anything in advance of a jury trial appears misplaced in the present case." The habeas court did not address this claim in its memorandum of decision, as it resolved the petitioner's *Brady* claim on the basis of its determination that the petitioner did not establish the existence of an undisclosed agreement between the state and Anthony Brown. The petitioner does not argue in her appellate briefs that this court should decline to address the respondent's claim that the requirements of *Brady* do not apply to the petitioner's case due to her guilty plea. Additionally, in her appellate reply brief, the petitioner did not address the state's claim concerning *Ruiz* and the applicability of *Brady* to the petitioner's case. At oral argument before this court, when asked

*Brady* violation on the basis of its determination that the petitioner had failed to demonstrate the existence of an undisclosed agreement between the state and Anthony Brown[18] because, even if we were to conclude that the court made a clearly erroneous finding or misapplied the

to address *Ruiz*, the petitioner's counsel argued that *Ruiz* is "not necessarily followed . . . in this state" and that, in the interest of "fairness," *Ruiz* should not be applicable, without elaborating further. We address the respondent's claim because "[i]t is axiomatic that [w]e may affirm a proper result of the trial court for a different reason"; (internal quotation marks omitted) *Sanchez* v. *Commissioner of Correction*, 203 Conn. App. 752, 760–61, 250 A.3d 731, cert. denied, 336 Conn. 946, 251 A.3d 77 (2021); and the question concerning *Brady*'s application is one of law. See *Turner* v. *Commissioner of Correction*, 181 Conn. App. 743, 752, 187 A.3d 1163 (2018) ("[w]hether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review" (internal quotation marks omitted)); see also *Tyson* v. *Commissioner of Correction*, 155 Conn. App. 96, 105 n.4, 109 A.3d 510 ("That the court relied on a wrong theory does not render the judgment erroneous. We can sustain a right decision although it may have been placed on a wrong ground." (Internal quotation marks omitted.)), cert. denied, 315 Conn. 931, 110 A.3d 432 (2015). Additionally, the petitioner will not be prejudiced because she had an opportunity to respond to this claim in her appellate reply brief, even though she failed to do so. See *Sanchez* v. *Commissioner of Correction*, supra, 761.

[18] Although we do not reach the merits of whether the habeas court's finding that the petitioner had failed to establish the existence of an undisclosed agreement between the state and Anthony Brown was clearly erroneous, in light of the habeas court's reference to the absence of "any *formal* agreement" and its statement that there was no "affirmative evidence showing that the state and Anthony Brown had an *actual agreement* disclosable to the defense"; (emphasis added); we, nonetheless, are compelled to reiterate that "the state's obligations under *Brady* are not limited to the requirement that it disclose the existence of what may be characterized as *a formal agreement* to provide some measure of consideration to a cooperating witness. Rather, '[t]he prerequisite of any claim under . . . *Brady* [pertaining to the state's failure to disclose an agreement with a cooperating witness] . . . is the existence of an undisclosed *agreement or understanding between the cooperating witness and the state*.' " (Emphasis in original.) *Brown* v. *Commissioner of Correction*, 230 Conn. App. 384, 403, 330 A.3d 134, cert. denied, 351 Conn. 921, 333 A.3d 103 (2025). Indeed, the principle that any agreement or understanding between the state and a cooperating witness need not be formal is underscored by the statements of our Supreme Court in *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 603, 198 A.3d 562 (2019), describing "the state's practice of informal, off-the-record leniency understandings with cooperating witnesses."

law governing what constitutes impeachment evidence under *Brady*, the petitioner's *Brady* claim still fails in light of *Ruiz*.

In *Ruiz*, the primary issue before the United States Supreme Court was "whether the [f]ifth and [s]ixth [a]mendments [to the federal constitution] require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose

Specifically, in *Marquez* the court stated: "These understandings . . . often involve a prosecutor's suggesting—although not promising—that a favorable recommendation to the sentencing judge and/or a reduction in the charges against the witness might be forthcoming in exchange for the witness' testimony inculpating another defendant. . . . Often such representations are made only to the witness' counsel, while the prosecutor's communication with the witness makes clear that there is no promise. Under such circumstances, the prosecutor may not actually know if any representations of possible leniency have been conveyed by the witness' counsel to the witness. Thereafter, if, before the jury, the witness denies that there is any actual 'agreement' or 'deal,' the prosecutor can accurately state, as the respondent argues in this case, that he does not have a reason to know if the witness is being untruthful. Although it might very well be accurate that no definitive promises have been made by the state, and, even if any possible outcomes as described to counsel might be 'tentative,' experienced counsel operating in a courthouse in which he or she is familiar with the practices of prosecutors and presiding judges can comfortably advise the witness of the possible credit that might follow from his testimony. Thus, these 'hypothetical' outcomes serve as a real incentive to motivate a witness to testify for the state.

"Left out of this equation, however, is the jury. See *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 369–73 (collateral review of conviction obtained by false testimony requires 'a careful review of that testimony and its probable effect on the jury'). These vague understandings can prevent defense counsel from effectively impeaching the witness for bias, perhaps leaving jurors 'with the impression . . . that [the witness did not have] any incentive to testify favorably for the state.' . . . Jurors are not well versed in the nuanced vagaries of such leniency agreements. Yet, we rely on jurors to assess a witness' credibility—including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be. This practice, therefore, carries with it risks that threaten the efficient and fair administration of justice." (Citations omitted.) *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 603–605. The court provided guidance on how those risks can be avoided; id., 607–608; and "encourage[d] prudence on the state's part in its dealings with cooperating witnesses." Id., 608.

'impeachment information relating to any informants or other witnesses.'" *United States* v. *Ruiz*, supra, 536 U.S. 625. In concluding that the constitution does not, the court explained that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* . . . . Of course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be. But the [c]onstitution does not require the prosecutor to share all useful information with the defendant. . . . And the law ordinarily considers a waiver [of the rights to a jury trial, to confront one's accusers, and against self-incrimination to be] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it."(Citation omitted; emphasis in original.) Id., 629. In other words, "the [c]onstitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." Id., 630. The court also reasoned that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the [g]overnment's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." Id., 631. The court further stated that the need for impeachment information "is more closely related to the *fairness* of a trial than to the *voluntariness* of the plea . . . ." (Emphasis in original.) Id., 633. In light of those considerations, the court concluded that "the [c]onstitution does not require the [g]overnment to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." Id. In a concurring opinion, Justice Clarence Thomas

stated: "The principle supporting *Brady* was 'avoidance of an unfair trial to the accused.' *Brady* v. *Maryland*, [supra, 373 U.S. 87]. That concern is not implicated at the plea stage regardless." *United States* v. *Ruiz*, supra, 634 (Thomas, J., concurring in the judgment).[19]

Connecticut appellate courts have confirmed that the rule in *Brady* seeks to ensure that a criminal defendant receives a *fair trial*. See, e.g., *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 308 n.62, 112 A.3d 1 (2015) (*Brady* "seek[s] to vindicate the defendant's fair trial rights"); *Gray* v. *Commissioner of Correction*, 236 Conn. App. 246, 254, 347 A.3d 270 (2025) ("The *Brady* rule is based on the requirement of due process. Its purpose is

---

[19] The United States Court of Appeals for the First Circuit has stated: "The animating principle of *Brady* is the avoidance of an unfair trial. *Brady* [v. *Maryland*, supra*,* 373 U.S. 87]. It is, therefore, universally acknowledged that the right memorialized in *Brady* is *a trial right*. See, e.g., *United States* v. *Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010). Consequently, courts enforce *Brady* in order to minimize the chance that an innocent person [will] be found guilty. . . . The core question is whether, despite the suppressed evidence, the accused received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . In urging us to extend *Brady*'s prejudice component to pretrial plea negotiations, the defendant exhorts us to break new ground. He does not cite a single case standing for this novel approach but, rather, relies on authority extolling the importance of plea negotiations. . . . Although we recognize that plea negotiations are important, that fact provides no support for an unprecedented expansion of *Brady*. See *United States* v. *Ruiz*, [supra, 536 U.S. 632] (warning that the benefits of plea bargaining would be undermined by an extension of *Brady* into the pretrial realm).

"The *Ruiz* [c]ourt evinced a reluctance to extend a *Brady*-like right to the realm of pretrial plea negotiations, holding flatly that the [c]onstitution does not require the [g]overnment to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant. . . . While the [c]ourt acknowledged that the more information the defendant has, the more aware he is of the likely consequences of a plea, it nonetheless concluded that a prosecutor has no obligation to share all useful information with the defendant during pretrial plea negotiations. . . .

"*Ruiz* teaches that *Brady* does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts. This makes good sense: when a defendant chooses to admit his guilt, *Brady* concerns subside." (Citations omitted; internal quotation marks omitted.) *United States* v. *Mathur*, 624 F.3d 498, 506–507 (1st Cir. 2010).

not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant *of a fair trial* . . . .” (Emphasis added; internal quotation marks omitted.)), cert. denied, 354 Conn. 909, 349 A.3d 1093 (2026); *Cator* v. *Commissioner of Correction*, 229 Conn. App. 393, 429, 327 A.3d 1028 (2024) (“*Brady* is a preconviction trial [right]” (internal quotation marks omitted)), cert. denied, 351 Conn. 919, 333 A.3d 105 (2025); see also *Poventud* v. *City of New York*, 750 F.3d 121, 154 n.3 (2d Cir. 2014) (Jacobs, J., dissenting) (“*Brady* is a trial right, formulated to safeguard the fairness of trial outcomes; it does not require disclosure of impeachment evidence during pretrial events, however critical. See *United States* v. *Ruiz*, [supra, 536 U.S. 633] (holding that the failure to disclose impeachment evidence prior to a guilty plea does not amount to a *Brady* violation) . . . .”); *Thomsen* v. *New York*, Docket No. 15cv2668 (DLC), 2016 WL 590235, *6 n.4 (S.D.N.Y. February 11, 2016) (*Brady* claim failed because *Brady* is trial right and plaintiff was neither tried nor convicted).

“In a criminal case, a trial begins when a jury is empanelled *and sworn* . . . .” (Citation omitted; emphasis added; internal quotation marks omitted.) *Thomas* v. *State*, 130 Conn. App. 533, 539 n.8, 24 A.3d 12, cert. denied, 302 Conn. 945, 30 A.3d 2 (2011); see also *State* v. *Roy*, 182 Conn. 382, 385, 438 A.2d 128 (1980). In the present case, the petitioner entered a guilty plea and waived her right to a trial. There is nothing in the record indicating that the jury had been sworn in prior to when the petitioner was presented with Anthony Brown’s statement and decided to plead guilty,[20] and the trial

[20] We note that Attorney Brown testified as to his recollection of when the prosecutor provided him with Anthony Brown’s statement, stating: “I don’t remember whether we were still picking a jury or whether the jury had been picked . . . but in the morning, when we went to court . . . [the prosecutor] approached [him], gave [him] a copy of [Anthony

court file in the petitioner's criminal case specifies that jury selection in the case had begun and that the case was disposed of "[p]rior to [the] [c]ommencement of [t]rial." The petitioner makes no argument on appeal that the jury had been sworn in and, thus, that her trial had commenced prior to when she was presented with the statement, and, in fact, acknowledges that she had been presented with Anthony Brown's statement "[j]ust before trial," on "the morning of the start of trial . . . ."[21] This is further demonstrated by the allegation in count two of the petitioner's amended habeas petition that she was denied due process as a result of the state's violation of *Brady* "prior to and/or during jury selection . . . ." Although the petitioner entered her guilty plea on the day that her trial was to commence, that does not change the fact that no trial occurred. In the absence of a trial, *Brady* imposed no obligation on the state to disclose the alleged impeachment evidence of an agreement between the state and Anthony Brown. See *Diaz* v. *Commissioner of Correction*, supra, 174 Conn. App. 796 ("the *Brady* rule applies . . . to impeachment evidence . . . which, broadly defined, is evidence having the potential *to alter the jury's assessment of the credibility of a significant prosecution witness*" (emphasis added; internal quotation marks omitted)). We also find unavailing the petitioner's claim that, if she had known of the alleged arrangement between the prosecutor and Attorney Brown, "it would have potentially changed the advice of her attorney and the recommendation to succumb to the pressure and plead guilty to the one day deal." This argument is based on speculation of a poten-

Brown's] statement . . . [and] asked [him] to review it . . . ." Although Attorney Brown could not recall when evidence was supposed to begin, he testified that it was "imminent," in that it was supposed to commence either on April 28, 2015, or within a few days. The petitioner similarly testified at the habeas trial that she was "in a suit" and "ready to go to trial" when she was presented with Anthony Brown's statement.

[21] We also note that the habeas court, in its memorandum of decision, found that Anthony Brown had provided his statement "just as [the petitioner] was ready to begin the jury trial," and that the petitioner "was on the cusp of her jury trial" when she decided to plead guilty and to forgo the trial.

tial change in the advice of Attorney Brown; see *Owen* v. *Commissioner of Correction*, supra, 234 Conn. App. 498–99; and it ignores the habeas court's crediting of his testimony "that he did not specifically recommend to [the petitioner] that she accept the guilty plea," and the court's finding that "the evidence establishe[d] that [the petitioner] herself decided to forgo a trial . . . ."

In light of *Ruiz,* we conclude that the habeas court properly denied the second count of the petitioner's amended habeas petition alleging a *Brady* violation.

The judgment is affirmed.

In this opinion the other judges concurred.